## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| _____ )<br><br>TODD GOLDMAN, )<br>)<br>Plaintiff, )<br>v. )<br>)<br>ELI WEISMAN, ROY REVIVO, )<br>QUALITY ART AUCTIONS, INC., )<br>AND NOAH WEISMAN, )<br>)<br>)<br>Defendant. )<br>_____ ) | Civil Action No. __23-7052__<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

### COMPLAINT

PLAINTIFF TODD GOLDMAN, by and through his attorneys the Law Office of Victor M. Feraru, as and for his Complaint against DEFENDANTS ELI WEISMAN, ROY REVIVO, QUALITY ART AUCTIONS, INC., AND NOAH WEISMAN, upon information and belief alleges the following:

### PRELIMINARY STATEMENT

1.      Todd Goldman, ("Todd" or from time to time "Todd's") is an artist well known for his quick-witted, pop art style paintings that have catchy taglines and poke fun at the foibles of human nature. Todd and his artwork have been featured in Variety Magazine, Vanity Fair Magazine, People Magazine, Seventeen Magazine, Life & Style Magazine, Entrepreneur.com, the Wall Street Journal, and Art Business Magazine. His work is considered relevant, highly collectible, and valuable to many celebrities and art collectors around the world. Todd has sold thousands of original paintings in fine art galleries in major cities, domestic and international, generating millions of dollars in revenue.

2.      Defendants in this action knew full well the popularity of Todd's work, and like a Trojan Horse, offered Todd help when he was down and needed it the most, but with sinister and egregious intentions.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332(a)(1) because this case is a civil action where the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different States.

4.      Venue is properly set in this District pursuant to 28 U.S.C. §1391(b) since Plaintiff's place of business is in the Southern District of New York, and Defendants transact business worldwide, including within this judicial district. Likewise, a substantial part of the acts and omissions giving rise to this action occurred within the Southern District of New York.  28 U.S.C. § 1391(b).

5.      Consistent with the Due Process Clause of the Fifth and Fourteenth Amendments, the Court has personal jurisdiction over Defendants, because Defendants directed his, her, its acts to the Southern District of New York, such that requiring an appearance does not offend traditional notions of fair play and substantial justice. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

6.      Further, all of Plaintiff's claims arise from conduct and agreements that Defendants engaged in in the Southern District of New York. Defendants knew or should have known, that Defendant having a primary place of business in the State of New York, having galleries showing his work in the State of New York, Plaintiff's office in New York, that in the event a legal controversy arose, the matter would be litigated in the State of New York. Further, with the U.S. Courts across this great Nation being through Zoom, requiring Defendants to make

an appearance in the Southern District of New York is fair and equitable. Finally, Defendants are bad actors, and as such, should not be able to choose a venue in this matter.

7.      This court also has personal jurisdiction over Defendants pursuant to and consistent with the Constitutional requirements of Due Process in that Defendants, acting through their agents or apparent agents, committed one or more of the following:

a.      transacts any business within the state or contracts anywhere to supply goods or services in the state; or

b.      commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or

c.      commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if it:

d.      regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or

e.      expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or

f.      owns, uses or possesses any real property situated within the state.

*See* N.Y. C.P.L.R. 302 (McKinney).

## **JURY TRIAL**

8.      Plaintiff demands a jury by trial in this action.

## PARTIES

9.      Plaintiff Todd Goldman is an individual who maintains an office within the Southern District of New York, specifically Manhattan.

10.     Defendant Eli Weisman ("Eli") is an individual who, upon information and belief, lives and resides in Venice Beach California, he is the owner of Quality Fine Art Auctions, Inc. ("Q Art"), a company incorporated under the laws of the State of California.

11.     Defendant Roy Revivo ("Roy") is an individual, who upon information and belief, lives and resides in North Hollywood, California.

12.     Defendant Noah Weisman ("Noah") is an individual, who upon information and belief, lives and resides in Fernando Valley, California.

## FACTS

### *Background*

### *Todd's Art Creates Substantial Buzz with the Press*
### *And Celebrities Alike Making His Art Culturally Relevant, and Valuable*

13.     Plaintiff Todd is an artist known globally for his quick-witted cartoonish paintings.

14.     Starting in or about 2000, Todd's art career as an artist took off with his clothing brand David & Goliath ("DG"), which quickly morphed into further commercial success.

15.     In or about 2004, during this first year as a fine artist with S2 Art Group, Todd had 10 art shows all of which were highly successful. Celebrities like Paul McCartney, Rihanna, the late Michael Jackson, Leonardo DiCaprio, Jessica Simpson, John Mayer, and Paris Hilton, among others,  have purchased Todd's art for his and her private collections.

16.     Between the years 2000 and 2009, Todd became known for his child-like almost silly cartoon characters which he created as part of his made-up world, "The Stupid Factory," and had major book publishing deals. In other words, his work was extremely marketable.

17.     In or about 2008, Todd worked with actor Ashton Kutcher to create an animated web series featuring Todd's illustrations called "Blah Girls," and then sold it to New York-based MTV.

18.     Todd sold several TV shows and movies based on his cartoon characters including a movie to Universal Studios based on his "Boys Are Stupid Throw Rocks at Them" Book with Elizabeth Banks as director, an animated cartoon to FOX Studios with Ashton Kutcher called "The Uglies", an animated cartoon to TBS with the Wayan Brothers called the "Black Family", an animated cartoon with Drew Carey to Nickelodeon called "Bear in Underwear" based off his kids book with the same title.

19.     Todd's brand David & Goliath grossed over ONE HUNDRED MILLION ($100,000,000.00) DOLLARS in sales with his art.

20.     DG sold to over THREE THOUSAND (3,500) FIVE HUNDRED retailers, had over 75 licensees, and international distributors in 40 countries.

21.     DG had 18 of its own "Stupid Factory" stores in major cities like Las Vegas in the Venetian Hotel, Honolulu, Maui, Prague, Dubai, Myrtle Beach, Key West, Vancouver, Philippines, London, and Los Angeles.

22.     DG had deals with major companies like American Greetings, Enesco, Heart Publishing, FOX Studios, Nickelodeon, Universal Studios, and Target.

23.     Todd had his own line at Target called, "Fred is Red," which grossed FIFTY EIGHT MILLION  ($58,000,000.00) DOLLARS in retail sales in its first year.

24.     American Greetings gave Todd his own greeting card collection where he had his own rack of 40 cards in Walmart and Target.

25.     DG was the prestige and notoriety of being a famous pop artist, selling thousands of paintings and millions of dollars a year in high-profile location galleries, which made all of these people and companies want to be in business with Todd. Todd sold over 3,000 paintings which generated $12 million in sales.

26.     DG was the press and celebrity collectors that made Todd and his art desirable. Without the galleries, Todd was just another one of millions of other graphic artists out there making tee shirt designs. The above-mentioned set him apart. He was shown in major art galleries in cities all over the world including; New York, Miami, Las Vegas, Las Angeles, Miami, London, Japan, Maui, Honolulu, Atlanta, Denver, Dallas, Chicago, San Francisco, Paris, New Orleans, and Hong Kong to name a few.

27.     The art galleries gave Todd major exposure in high-trafficked marketplaces like the Venetian casino in Las Vegas, The Grove in Los Angeles, and Covent Gardens in London, establishing him as a legit pop artist. And where celebrities like Rihanna bought his work and named Todd her favorite artist in Vanity Fair magazine. It was this exposure and press that set Todd apart from other artists.

28.     Since Todd's art style was so commercial his designs were not only shown as paintings in art galleries but also on hundreds of merchandise products that were sold in retail stores. It was this double exposure that instantaneously made Todd a household name and catapulted his fame.

### *Todd Meets Defendants, Develops a Relationship*
### *Defendants Will Later Exploit*

29.     In or about the years 2005 through 2009, Todd's exclusive agent was S2 Art Group of Las Vegas, Nevada.

30.      S2 Art Group of Las Vegas, Nevada had galleries in Las Vegas, Chicago, Ft. Lauderdale, Los Angeles, and New Orleans. As well as sold to many other galleries in major cities around the world.

31.     King Features of Heart Publishing was Todd's exclusive licensing agent which brokered the S2 Art deal as well as over 50+ other licensing deals with Todd's art.

32.     Todd had between 30 to 40 art shows between these galleries and additional shows in Denver, Detroit, Hawaii, New York, London, Miami, Atlanta, and San Francisco.

33.     In or about 2010, Todd met the Owners of Q Art, Defendants, Eli and Noah Weisman.  At that time, S2 Art Group filed for bankruptcy and the trustee was selling S2 Art's assets among which were some of Todd's art, where he met the Q Art owners.

34.     In or about 2010, Defendant Eli Weisman of Q Art purchased some of Todd's lithographs and posters from the bank representing the bankruptcy for S2 Art.

35.     In or about 2010, Defendant Eli Weisman of Q Art purchased some of Todd's lithographs from the bank representing the bankruptcy for S2 Art.  This was the first time Todd met Defendant Eli Weisman who is in the business of buying and selling art. At the time Todd needed a venue to sell some of his less popular art that had not yet sold at S2.

36.     In or about 2010, Todd sold a number of his unsold S2 paintings and discontinued lithographs with Eli on the Q Art website, which was known for close-out discount and auction prices. This was a way for Todd to make some extra money and clear out his obsolete inventory. Todd and Eli did business together for several years on the Q Art website, selling Todd's less

popular, older inventory on one hand, on the other, Todd continued to sell his newer paintings at full price in art galleries around the world.

37.     Todd considered Eli a friend, so he thought, and even hung out with Eli personally outside the business. Todd would sometimes stay over at Eli's house on Venice Beach and the two would often have dinner and drinks together. Eli even invited Todd to travel with him to Israel on several occasions which Todd declined.

38.     Eli knew much of Todd's personal life and vice versa and Eli even knew his ex-wife Nicole, which Todd later found out Eli contacted her during their divorce in an effort to further squeeze Todd. Eli also confided in Todd that he was having an affair with his own brother's wife, which made Todd very uncomfortable and should have been a red flag for things to come on what type of person Eli was to be sleeping with his own brother's wife. Eli commissioned a painting from Todd for this woman of a hand with fingers crossed saying "Me and God Are Like This." Eli pretends to be religious and hides behind his Jewish faith, but obviously doesn't practice what he preaches, as sleeping with your brother's wife probably isn't considered kosher in the Torah.

### *Todd Turns To Defendants Who Bait, Switch, Attempt to Confuse, and Pull the Ultimate Con*

### *Loan One*

39.     In or about 2014, Todd was confronted by an unexpected and very expensive divorce and custody battle for his daughter that cost him all of his savings, costing him millions of dollars in legal fees, which pale in comparison to what Defendants had in store for him.

40.     In or about 2016, Todd, nearly bankrupt, needed to continue to pay for his legal fees and Defendants Eli Weisman ("Eli") and Roy Revivo ("Roy") offered to lend Todd money.

41.     As a so-called friend Todd confided in Eli about his divorce at which Eli later used this inside information against him.

42.     In or about 2016, Eli agreed to enter into a loan agreement with Todd, going as far as writing up a loan agreement; however, at the last minute, Eli changed his mind and introduced him to his longtime high school friend Roy, who is in the business of lending money.

43.     At all times relevant to this complaint, Eli Weisman knew Todd's stellar reputation in the art world, and the prices his art sold for, and conveyed this information to Roy.

44.     On March 4, 2016, Todd took out his loan for FORTY THOUSAND ($40,000.00) DOLLARS, from Roy Revivo as a balloon payment note due September 2, 2016. This loan was backed solely by Todd's fine art located at Q Art, the terms of which were set out in a written Promissory Note ("Note") Secured by A UCC-1 Statement.

45.     The Note was backed by approximately 2,500 outdated signed lithographs from S2 Art and a few thousand old FIVE ($5.00) DOLLAR posters from S2 Art, which were located in Q Art's warehouse. Not *all* of Todd's fine art, which he had stored in his Los Angeles Art studio at his home, his Florida company's warehouse, and in various art galleries.

46.     The list of the lithographs with prices that were security for the above-mentioned FORTY THOUSAND ($40,000.00) DOLLAR loan are as follows:

```
TG 828 After Dinner Drink 28-1/2" x 21"
TG 827 Frank Lloyd Wrong 26-1/2" x 17-1/2"  (Estimated Value $700.00)
TG 826 It's OK to Lie, I'm a Lawyer 32-1/2" x 31-3/4"  (Estimated Value $850.00)
TG 822 Five Card Stud 30-1/2" x 22-1/2"  (Estimated Value $750.00)
TG 821 I Don't Repeat Gossip so Listen Carefully 34-1/2" x 23" (Estimated Value $350.00)
TG 820 I Can Tell Your Bag is Fake 36-1/2" x 27" (Estimated Value $800.00)
TG 818 We Met on the Web 27-1/2" x 27-1/2" (Estimated Value $550.00)
 TG 817 Spandex is a Privilege Not a Right 31" x 25-1/2" (Estimated Value $750.00)
TG 816 I Bring Nothing to the Table 35-1/2" x 26-1/2"  (Estimated Value $700.00)
TG 815 Boys Can't Accessorize 23-1/4" x 35"  (Estimated Value $800.00)
TG 808 You Say I'm A Bitch 27-1/4" x 36-3/4"  (Estimated Value $900.00)
TG 804 Run Around in My Underwear 33" x 27"  (Estimated Value $1,100.00)
TG 803 Who's Your Daddy 32-1/4" x 31-1/4"  (Estimated Value $850.00)
TG 802 Goodbye Kitty King Kong 32-1/2" x 42"  (Estimated Value $900.00)
```

TG 801 Size Does Matter 8" x 8" (Estimated Value $500.00)
TG 800 Goodbye Kitty Chinese Food 42" x 27" (Estimated Value $850.00)
TG 798 Ex-Boyfriend 32" x 32"   (Estimated Value $800.00)
TG 796 One Night Stand 21" x 22"   (Estimated Value $800.00)
TG 795 Sushi 21-1/2" x 22" (Estimated Value $650.00)
TG 793 Gold digger 35-1/2" x 28" (Estimated Value $1,100.00)
TG 783 Smoking Kills 32" x 32" (Estimated Value $1,100.00)
TG 781 This Sucks 28" x 28" (Estimated Value $850.00)
TG 780 Boys are Stupid, Throw Rocks at Them 42-1/2" x 32" (Estimated Value $1,300.00)
TG 779 Peas on Earth 32" x 32" (Estimated Value $1,100.00)
TG 849 Spooning Leads to Forking 24-1/2" x 35-1/4" (Estimated Value $800.00)

47.     Although Todd signed the note, Roy neither signed nor acknowledged acceptance and the UCC Statement was never signed or filed.

48.     At all times relevant to this Complaint Eli worked with Roy to sell, exploit, and reproduce without authorization, Todd's art.

49.     In or around 2017, Todd was not able to repay the FORTY THOUSAND ($40,000.00) DOLLARS loan, plus interest, and elected instead to allow Roy to keep the above-mentioned lithographs and posters. It is estimated that Roy netted nearly ONE HUNDRED ($100,000.00) DOLLARS from the sale of these lithos and posters on Eli's Q Art.com website and other online auction sites

### *Defendant Baits, Switches, and Defrauds Plaintiff*
### *Insurmountably Damaging Plaintiff*

50.     In or about March 2017, Todd needed additional monies to fund his ongoing divorce proceedings.

51.     A year later, in or about March 2017, Todd contacted Roy again and the two negotiated a new ONE HUNDRED ($100,000.00) DOLLAR loan, with the same terms as the 2016 loan, above, except this loan would be secured by EIGHT (800) HUNDRED paintings valued at THREE MILLION, FIVE HUNDRED THOUSAND ($3,500,000.00) DOLLARS retail.

52.     At that time, Todd was in negotiations to sell his paintings on cruise ships and was opening a large set of retail chains in Europe as Todd's art was still extremely valuable and Defendants' knew this, understanding through his/her/its scheme it would create a windfall of profit. Todd only came to Roy as he needed immediate funds to continue to pay for his expensive and protracted divorce.  Todd knew he only had to sell on average 40-50 of the 800 paintings to pay back the $100,000 loan, which would be easily accomplished in no time selling on the cruise ships.

53.     Todd shared this information about the cruise ships and European client with Roy as a means to secure the loan, not realizing Roy would use this information against him later.

54.     In or about March 2017, Roy requested to inspect the paintings that Todd used as collateral for the proposed loan. At that time, all of Todd's 800 paintings were being stored in a warehouse in Orlando, Florida at Todd's master licensing manufacturer ERE, Inc., note 800 paintings is an extraordinary amount of work, expense and labor taking Todd at least 5 years to paint. Roy was holding hostage Todd's entire inventory preventing him from doing any business whatsoever.

55.     Roy then hired a truck to pick up the 800 paintings in Orlando, Florida and have them shipped across the country to his office in North Hollywood, California. See attached Bill of Lading. As a sign of good faith, in or about March 2017, Defendant Roy agreed to advance Todd TEN THOUSAND ($10,000.00) DOLLARS before picking up the paintings.

56.     In or about March 2017, Todd demanded Roy put the loan agreement into writing; however, Roy intentionally refused to do so, as Roy intended to defraud Todd.

57.     Under extreme duress, Todd was in such financial distress that he trusted Roy and agreed to allow him to pick up the paintings without a signed contract which Roy agreed to sign after the inspection of the artworks.

58.     In or about March 2017 to the present, all Defendants, jointly and severally, intended to extort, hold for ransom and defraud Todd of all his art, and take advantage of his dire situation.

59.     In or about March 2017, Todd, unaware of Roy's malicious, calculated, nefarious intent, Todd reluctantly agreed to allow Roy to pick up the paintings without a signed contract.

60.     In or about the Spring of 2017, Roy hired a transportation trucking company to pick up the art in Florida and transport it back to his location in California.

61.     In or about the Spring of 2017, prior to Todd's art being picked up by the transport company, Todd again demanded that Roy follow through with putting the instant agreement in writing on one hand, while Roy insisted he needed to inspect the paintings before he would agree to do so on the other. Todd reasonably believed that Roy would reduce such into writing on the other.

### Defendant Roy Unilaterally Changes the Agreement and Begins Extorting Plaintiff

62.     In or about the Spring of 2017, the moment Roy received the paintings Roy unilaterally altered the terms of the loan arrangement, in furtherance of his fraud as against Plaintiff.

63.     Todd went to Roy's offices and photographed and logged in all of his paintings which were being stored in a non-air-conditioned trailer. Todd demanded that his paintings be stored in better conditions as they will get ruined and stick together from the extreme heat. Roy refused and as expected most of the paintings were damaged.

64.     As a result of no longer having possession of his paintings, as Roy was holding them hostage, Todd lost his cruise ship opportunity and European client costing him millions in lost sales and potential other business deals.

65.     In or about the Spring of 2017, Roy, with Todd's art now in hand and knowing about the cruise ship deal, demanded that Todd agrees to FIFTY (50) PERCENT of the future sale of the paintings, or ONE MILLION, SEVEN HUNDRED, FIFTY THOUSAND ($1,750,000.00) DOLLARS, representing an EIGHT HUNDRED SEVENTY-FIVE ($875,000.00) DOLLARS, or EIGHT HUNDRED, SEVENTY-FIVE (875%) PERCENT interest rate.

66.     In or about the Spring of 2017, Todd demanded his paintings back from Roy and agreed to refund the $10,000 that Roy advanced to him.

67.     In or about the Spring of 2017, Roy with fraudulent, malicious, calculated intent, demanded that Todd pay TWENTY-FIVE THOUSAND ($25,000.00) DOLLARS, as opposed to the TEN THOUSAND ($10,000.00) DOLLARS, in direct contravention of the entire loan agreement to return Todd's EIGHT (800) HUNDRED pieces of art.

### Defendants Continue to Commit Crimes
### and Frauds Upon Plaintiff

68.     Thereafter, over the next few months, Todd continued to demand his artwork be returned but Roy refused and held Todd's paintings in a hot trailer where they were being destroyed. Todd hired a lawyer and sent a demand letter to Roy and went to Los Angeles police and filed a report to no avail.

69.     Eventually Roy's extortion worked, and Todd had no choice but to agree to pay Roy, and Todd eventually agreed to give Roy the TWENTY-FIVE THOUSAND ($25,000.00) DOLLARS, as opposed to the TEN THOUSAND ($10,000.00) DOLLARS, in direct

contravention of the entire loan agreement to return Todd's EIGHT (800) HUNDRED pieces of art.

70.     Thereafter, Roy and Defendants demanded even more money, extorting Plaintiff, instead demanding that Todd now pay instead FIFTY THOUSAND ($50,000.00) DOLLARS, as opposed to the TEN THOUSAND ($10,000.00) DOLLARS, in direct contravention of the entire loan agreement to return Todd's EIGHT (800) HUNDRED pieces of art. Roy and Defendants had no intention of returning the pieces of art to Todd, it/they/he/she intended on taking advantage of Todd's being distracted and financially strapped due to his divorce, to execute the perfect con job against Plaintiff. Meanwhile time was passing and Todd was losing millions of business opportunities with his art.

### *In Addition to Defendants' Frauds, They/It Breached They/Its' Duty to Secure the Artwork as a Reasonably Prudent Art Dealer Would*

71.     Additionally, Defendants, not being the owner of the above-mentioned paintings, holding such as collateral to a loan Defendant's had no intention of funding, had a duty would to safely store, secure, handle, and otherwise take reasonable care of the 800 paintings while they were in Defendants care, custody, and control.

72.     At all times relevant to this Complaint, Defendants negligently, recklessly and carelessly proceeded to store the paintings in a trailer without air conditioning or any air quality control.  This caused the paintings to overheat and stick together, damaging the paintings beyond repair.

**Defendants Continue to Hold Todd's 800 Paintings Illegally**

73.     In or about 2017, Todd emailed Roy saying that he had a potential buyer in Europe who might be able to buy all the paintings that secured the note. However, at this point, the loan was not fully funded, the terms unilaterally changed, and the artwork was held to ransom.

74.     On or about August 15, 2017, Todd emailed demands of Roy, an inventory of the EIGHT (800) HUNDRED paintings with the intent that Todd could sell the art elsewhere. At this point, Todd was trying everything he could to work around the extortion, theft, and nefarious intent of Defendants.

75.     On August 21, 2017, Todd contacted Eli and Roy urging the two defendants to contact him so he could photograph his art and sell it to the potential overseas buyer. Todd then agreed to pay TWENTY-FIVE (25%) PERCENT interest on the borrowed money. The same day, Roy *finally* replied to Todd's demand. In the response Roy told Todd that he would be open to discussions, however, any agreement made must be with Eli because he was the one selling the art. Eli, like his co-conspirator Roy Revivo, attempted to strong-arm Todd into increasing his commission for selling art.

76.     On or about August 26, 2017, Todd was still denied access to the EIGHT (800) HUNDRED paintings by Defendants.

77.     On or about August 26, 2017, Todd placed Defendants on notice that the paintings were not stored properly, and would be ruined as the art was being kept in a hot trailer. At that time, Todd requested that Defendant Eli Weisman and Roy Revivo contact him before he left for New York City for his art show to set a date to photograph the paintings Roy was storing on his behalf.

78.     In or about October 2017, Roy finally agreed to allow Todd to photograph all the paintings.

79.     In or about October 2017, the paintings were, as Todd suspected, so incredibly damaged from the heat that he could not, in good faith, sell the paintings to his buyer in Europe.

### *Todd's Exhibition Opportunities Turn to Failures*

80.     In or about September and October 2017, Todd's "Never Grow Up Show" which features his one-of-a-kind acrylic paintings on canvas at the Ross Art Gallery in New York sold only five paintings out of 100 at the Ross Art Gallery, a nearly impossible failure.

81.     In or about September and October 2017, Todd's "Never Grow Up Show" which features his one-of-a-kind acrylic paintings on canvas at the Ross Art Gallery in New York sold only five (5) paintings out of the ONE (100) HUNDRED at the Ross Art Gallery, which was not only completely uncommon, was due to Defendants illegally, without authorization, reproduced the paintings held as collateral made by Q Art and sold on multiple websites, throughout the world, for fire sale prices, unauthorized sales and reproduction have taken place at the hands of Defendants.

### **Todd Goldman Files for Bankruptcy and Defendants Use Process**

82.     In late 2018, Todd filed for Chapter 7 bankruptcy.

83.     In or about late 2020, as Todd was gathering information concerning his artwork for the Bankruptcy Trustee, he then discovered that Eli and Roy were now selling the original 800  paintings, in addition to reproducing such without authorization, that were stolen from him in Florida, mentioned above.

84.     In or about late 2020, Eli and Roy started selling these paintings immediately after Todd filed Bankruptcy, the two were, without ownership or authorization from Todd, selling, at

hugely, discounted prices, many more than FIFTY (50%) PERCENT off priced, while others were being bid on online auctions going for as low as TEN (10%) PERCENT of Todd's normal retail pricing, the effect of these unauthorized, reduced priced sales, was a complete destruction Todd's art market and brand.

85.     This destruction of Todd's art brand had a domino effect and not only hurt his fine art gallery business but also his merchandise licensing business, book publishing business and TV/movie business. That's because Todd's prominent art career and exposure in fine art galleries was the catalyst for all of his other business opportunities.

86.     As a measure of the damaging effect of Todd's business before and after Eli and Roy stole his paintings and started selling them online at huge discounts - destroying his brand and career, costing him millions of dollars in lost sales and future opportunities:

| | | |
|---|---|---|
| Todd published books | before: 40 | after: 1 |
| Todd selling in fine art galleries | before: 50+ | after: 3 |
| Todd TV shows in development: | before: 10+ | after: 0 |
| Todd movies in development | before: 3 | after: 0 |
| Todd licensing deals | before: 75 | after: 0 |
| Todd international distributors | before: 40 | after: 0 |
| Todd Stupid Factory retail stores | before: 18 | after: 0 |
| Todd other retail stores sold | before: 3500 | after: 0 |
| Total paintings sold | before 4000 | after 10 |

87.     In or about late 2020, Eli and Roy waited until Todd's bankruptcy to use the bankruptcy process to complete their con against Todd.

88.     In or about late 2020, Eli and Roy waited until Todd started bankruptcy proceedings as they believed Todd would *not* include the 800 pieces of his art Defendants stole as assets for his estate; however, Todd honestly reported such assets to the Bankruptcy Trustee.

89.     In 2021, Defendants without authorization produced, marketed and sold thousands of fake prints and giclee copies of Todd's copyrighted art for sale on multiple online websites and auctions, including fake prints being sold by Eli at QArt.

90.     In 2021, Todd wrote Eli and Roy and demanded that Roy and Eli take down the fake copies of his art listed for sale.

91.     At no time did Todd produce giclee prints with his art.

92.     At all times relevant to this complaint, Todd has only made original paintings, lithographs, and posters with S2 Art, and a few paper prints with licensees under DG.

93.     Further, in 2021, Todd also discovered that a COA (Certificate of Authenticity) was provided with the giclee prints from QArt.

94.      In or about 2021, Eli, without authorization, scanned, marketed, and sold Todd's original paintings, making giclees, and forging Todd's name, to over 200 different images, with an average multiple of 50-100 each. Eli and Roy made at least TEN (10,000.00) unauthorized prints of Todd's artwork without his knowledge or consent and thereafter Defendant sold it online for huge profit.

95.     On February 13, 2019, Todd emailed Roy Revivo to notify him that he had seen his paintings for sale on Q Art and multiple other websites for sale and requested that they be taken down immediately. Todd could not believe Roy Revivo was selling his paintings on Q Art

after they had spoken the week before and Roy Revivo had agreed that he would not sell the paintings.

96.     Not only had Roy stolen 800 of Todd's paintings, preventing him from selling them to galleries and cruise ships, but he and Eli were now selling the stolen paintings themselves, making thousands of dollars a week. And on top of that they were making thousands fake giclee prints, forging Todd's name, and selling those as well making even more money of Todd's name and art.

97.     In 2020, Todd discovered that unauthorized giclee prints of his art with his forged signature and fake certificates of authenticity for sale on numerous websites including Qart and eBay, unthinkable fraud that Defendants perpetrated. Todd had not made copies of these works of art previously and had not authorized anyone else to make copies of these works of art. At no time did Todd give Roy the authority to sell, copy, sign his name, or otherwise use this art for his own purpose.

98.     Plaintiff through legal counsel sent a demand in good faith, demanding financial compensation for the unthinkable fraud and extortion that damaged Plaintiff.  Notably, Defendant threatened to sue that legal counsel from doing her job, in an attempt to intimidate, threaten, harass, and discourage Plaintiff's legal counsel from pursuing action.

99.     At all times relevant to this complaint, to the present day, Defendants have, as against Plaintiff have and continue to reproduce, and sell on multiple websites, throughout the world, for fire sale prices, Defendants.

100.     As a result, the New York City, New York, and other gallery owners that once strived to have Todd's art on exhibit now turned Todd away because the online art market was flooded with low-cost fake copies of Todd's art. Additionally, clients that previously bought

Todd's art before were calling up the galleries and demanding full refunds due to the discounted prices of Todd's work all over the Internet.

101.    In or about from 2017 to the present time, Roy and Eli have advertised and sold Todd's paintings throughout the Internet on websites such as Qart.com and multiple other online auctions sites completely destroying his reputation, brand, and art market, selling at steeply reduced prices, rendering Todd's work nearly worthless, ruining business opportunities, diluting Todd's brand, due to the unauthorized reproduction and sale.

102.    At all times relevant to this Complaint, Defendants' unauthorized reproduction and sale of Todd's art has watered down his brand.

103.    At all times relevant to this Complaint, the demand for Todd's work has not waned, and his ability to price and control the sale of his copyrighted works has reduced Todd's earning capacity by millions of dollars.

104.    Instead of Todd's art going up in value over time, like most artists, Todd's paintings were now rendered worthless due to Defendant's intentional, reckless and blatant actions.

105.    At all times relevant to this complaint, defendant has sold, reproduced, forged at least 103 works of Art that Todd has copyrights registered to with the United States Copyright Office. Annexed hereto is the Copyrighted Work and Copyright Infringed Work Schedule.

106.    In copying Todd's artwork shot-for-shot, Defendants willfully and intentionally sought to appropriate Defendant's hard work for their own profit without bearing the cost thereof. Defendants sought to realize the same profit without investing the same amount of time, money, and creative thought, and to take away profits from Plaintiff that he would have realized but for their wrongful acts.

107.    At all times relevant hereto, Plaintiff has been and still is the holder of the exclusive rights under the Copyright Act of 1976 (17 U.S.C. §§ 101 et. seq., and all amendments thereto) (the "Copyright Act") to reproduce, distribute, display, or license the reproduction, distribution, and/or display of his drawn and painted work, listed on Exhibit 1 attached hereto, which is the subject of this action, throughout the United States.

### AS AND FOR A FIRST CAUSE OF ACTION
### (Copyright Infringement Against All Defendants)

108.    Plaintiff repeats and realleges the averments contained in paragraphs 1-107 as though fully set forth herein.

109.    The above-described conduct by Defendants constitutes willful copyright infringement under the Copyright Act.

110.    By reason of the copyright infringement described above, Plaintiff is entitled to recover Defendants' profits to the extent the same are not included as part of Plaintiff's damages.

111.    In the alternative, at the election of Plaintiff, Plaintiff is entitled to recover from Defendants statutory damages up to ONE HUNDRED, FIFTY THOUSAND ($150,000.00) DOLLARS per copyright infringed for Defendants' willful copyright infringement, plus attorneys' fees.

112.    As a result of the above-described conduct by Defendants, Plaintiff has been damaged in an amount to be proven at trial, but in no event less than FIFTY MILLION ($50,000,000.00) DOLLARS.

### AS AND FOR A SECOND CAUSE OF ACTION
### (Usuary against All Defendants)

113.    Plaintiff repeats and realleges the averments contained in paragraphs 1-112 as though fully set forth herein, and also states that together, Defendants made a misrepresentation

or a material omission of fact which was false and known to be false by defendant, specifically, as set forth above. Together, Defendants, knowingly demanded and took on a loan at a rate that exceeds SIXTEEN (16%) PERCENT per annum or more.

114.    As a result, by reason of the foregoing, Plaintiff demands judgment, as against Defendants in an amount to be determined at trial, but in no event less than FIFTY THOUSAND ($50,000.00) DOLLARS, together with costs, disbursements, and reasonable attorney's fees in prosecuting this action.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Breach of Bailment against All Defendants)

115.    Plaintiff repeats and realleges the averments contained in paragraphs 1-114 as though fully set forth herein, and also states that together, Plaintiff and Defendants intended to create a bailment contract between themselves when Plaintiff shipped and Defendant accepted delivery of possession of the bailed items, as more specifically set forth above, and Defendants having accepted the items, set forth above, by Plaintiff. Defendants agreed to hold Defendant's works of art as collateral for a loan.

116.    At all times relevant to this Complaint, Plaintiff understood that he was giving the paintings to Defendant for collateral for loan. Plaintiff trusted that Defendant's would properly store and care for his art in such a way that it would not be damaged.  Plaintiff reasonably believed that the paintings would be returned to him once he repaid the intended loan. At no time did Plaintiff authorize Defendant's to use his paintings for any purpose other than to store the paintings.

117.    Plaintiff's ownership interest in the paintings was intentionally and wrongfully violated on several counts as set forth above. Plaintiff was denied access to the paintings when he

requested to photograph them to show to a prospective buyer. Defendants made copies of the paintings which they sold without Plaintiff's authorization.

118.    The aforementioned acts by Defendants caused Plaintiff to lose an estimated ONE MILLION, FIVE HUNDRED THOUSAND ($1,500,000.00) DOLLARS in revenue from the lost and destroyed paintings. Plaintiff's paintings were completely destroyed, and Plaintiff lost business opportunities because he was denied access to his paintings.

119.    As a result, by reason of the foregoing, Plaintiff demands judgment, as against Defendants in an amount to be determined at trial, but in no event less than ONE MILLION FIVE HUNDRED THOUSAND ($1,500,000.00) DOLLARS, together with costs, disbursements, and reasonable attorney's fees in prosecuting this action.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Fraud against All Defendants)

120.    Plaintiff repeats and realleges the averments contained in paragraphs 1-119 as though fully set forth herein, and also states that together, and states that Defendants repeatedly made statements and undertook acts, knowing that such statements were false, with the intent to deceive Plaintiff. Plaintiff reasonably relied on the false statement, and Plaintiff was damaged by such, as set forth below and above.

121.    Defendants took possession of Plaintiff's paintings under the guise that they were holding them as collateral for a loan.

122.    Then in a series of emails, as mentioned above, where Plaintiff requested to finalize the terms of the loan, Defendants repeatedly intentionally delayed and put off his requests.

123.    Ultimately, Defendants only funded a portion of a loan, and bait and switched Plaintiff as stated above, which was not merely a breach of contract, but out and out fraud.

124.    After having received the paintings, Defendants, fraudulently, maliciously, without authorization, consent, or notice, produced copies of Plaintiff's paintings that were in it/his/their possession as bailments, and began selling those paintings all over the world.

125.    In addition to selling these paintings, Defendants began to list prints of these paintings on multiple websites including the QArt website for sale at fire sale prices. These prints were sold with fake certificates of authenticity and Defendants forged Plaintiff's signature.

126.    At all times relevant to this Complaint, Defendants knew their/it/his words and actions that they would store Plaintiff's works of art for the purposes of holding such as collateral were materially false. Defendants intended, and did, begin to mass produce original works of art for his/their/its pecuniary gain.

127.    Plaintiff was incredibly damaged by Defendants acts.

128.    WHEREFORE, by reason of the foregoing, Plaintiff demands judgment, as against Defendants in an amount to be determined at trial, but in no event less than one million ($1,000,000.00) dollars, together with costs, disbursements, and reasonable attorney's fees in prosecuting this action.

129.    FURTHER, by reason of the foregoing, Plaintiff requests an injunction in his favor, as against Defendants, enjoining Defendants from further producing unauthorized paintings of Plaintiff, and that a constructive trust be established to claw back the ill-gotten gains from Defendants improper acts.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests judgment against Defendants as follows:

a)    Awarding compensatory, and punitive damages in Plaintiff's favor;

b)      the equitable relief of a permanent injunction in Plaintiff's favor as against

Defendants;

c)      the creation of a constructive trust while damages in favor of Plaintiff, as against

Defendants are assessed;

d)      Awarding Plaintiff reasonable attorneys' fees, costs, and expenses incurred in

prosecuting this action; and

c) Granting Plaintiff all such other relief as may be just and proper.


Dated:  August 10, 2023

                                        LAW OFFICE OF VICTOR M. FERARU


                              By: _____
                                        Victor M. Feraru, Esq., 4072
                                        1225 Franklin Avenue
                                        Suite 325
                                        Garden City, New York 11530
                                        Tel: 516-22415-2114
                                        E: victor@vicslaw.com
                                        *Attorney for Plaintiff Todd Goldman*